UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHARON HANNEMAN o/b/o
RANDY HANNEMAN, deceased,

    Plaintiffs,

  v.                              Case No. 04-C-1071

JO ANNE B. BARNHART,

    Defendant.

**DECISION AND ORDER**

This case is before me on a review of the decision of an administrative law judge denying Social Security disability benefits to Randy Hanneman, of Oshkosh, now deceased. Hanneman had alleged disability due to osteoporosis with an onset date of December 10, 1999. In short, he alleged experiencing pain in several limbs (especially his left knee) as well as his back. In addition, he had cataracts in both of his eyes and had a full scale IQ of only 74. All of these factors, he claimed, rendered him disabled within the meaning of the Social Security Act. Following a hearing in 2002, the ALJ disagreed, finding Hanneman less than credible and concluding that Hanneman's infirmities–both mental and physical–did not prevent him from performing sedentary jobs within the national economy. The Appeals Council denied review, meaning that the ALJ's decision stands as that of the Commissioner of Social Security. For the reasons given herein, I conclude that the ALJ's decision should stand.

**I. Background**

The claimant challenges only certain of the ALJ's conclusions, and I will accordingly limit my discussion to the matters at issue now as well as those pertinent issues raised at the hearing. Randy Hanneman attended special education classes in the Oshkosh School District until 10th grade. His employment after that consisted of semi-janitorial work at his parents' tavern, followed by another janitorial job at the Experimental Aircraft Association (EAA) in Oshkosh. In 1996, however, he broke his arm and shattered bones in his knee, which prevented him from engaging in the same level of job activity. Following his return to work, he was put on light duty (e.g., light dusting and cleaning), but the EAA ultimately fired him in 1999 because his ability to work was no longer adequate.

Hanneman's primary treating physician was Dr. Farrell of the Affinity Medical Group in Oshkosh. He saw Dr. Farrell in late 1999 for a knee scan and x-rays of the hip and spine, and Farrell released Hanneman to work with pain medication and calcium supplements to combat osteoporosis. At that time, Farrell's notes indicate Hanneman was "blasé" about continuing to work. The notes also indicate Hanneman was experiencing a "great deal of chronic musculoskeletal pain." (Tr. 124.) By early 2000 Hanneman had been let go at the EAA and informed Farrell that he was applying for Social Security benefits. Farrell wished him luck and said he would help if he could. Notes from February 2000 also indicate ongoing concerns about osteoporosis as well as chronic pain. (Tr. 123.) In June 2001, Farrell again examined Hanneman, this time at the request of the Wisconsin Division of Vocational Rehabilitation. In his report, Farrell noted the history of osteoporosis, as well as concerns about Hanneman's lack of exercise, chronic smoking and hypertension. He concluded that Hanneman had chronic musculoskeletal pain, but that "it may be

2

difficult to provide a demonstrable organic etiology to the patient's pain." (Tr. 217.) Farrell also filled out a lumbar spine residual functional capacity (RFC) form, in which he notes Hanneman could not walk one city block without pain or resting, and that he could sit only 15 minutes at a time before needing to get up. He also indicated that Hanneman could sit "about 4 hours" during an 8-hour workday and stand or walk less than 2 hours. (Tr. 174.) Farrell also noted that Hanneman would need 6 unscheduled 5-minute breaks during the workday and he could not be expected to lift more than 10 pounds while on the job, and even then only rarely. While he could occasionally climb stairs, he could "never" twist or climb ladders, and only rarely stoop or crouch. (Tr. 176.) He also believed that Hanneman would require at least four days off per month to account for his impairments or treatment.

Several months later, at Hanneman's request, Farrell wrote a letter ("to whom it may concern") consolidating his conclusions. "At this time it appears that the patient remains unable to work in his former capacity as janitor and would be equally limited with respect to other manual activities. His best hope for future employability would be training for a non-manual occupation. I suspect however, that obstacles to this course of action may arise out of his objections even to prolonged sitting." (Tr. 178).

Hanneman's record was reviewed by two state agency physicians in 2000 and 2001, and both concluded that he could stand or sit for six hours in an eight-hour workday, as well as lift 25 pounds frequently. He also saw Dr. A. Neil Johnson of Fond du Lac in 2000. Johnson concurred with Hanneman's statement of his limitations, finding that his pain "interferes with all his activities" and that "he could not do any heavy lifting" (although he could lift 25 pounds) or "standing or walking." (Tr. 138.) Hanneman also had cataract surgery during 2001. (Tr. 178.) The surgery

3

apparently helped his vision in his right eye, from which he could see "okay," but his left eye was "still blurry." (Tr. 245.)

In addition to these physical examinations, Hanneman also had a psychological examination with Dr. James Armentrout, Ph.D. Armentrout observed that Hanneman was about to walk and move without difficulty and "sat through our meeting without complaints," although he started shifting around and walked with a slight limp at the end. (Tr. 166.) He was given several standard tests, including the Wechsler Adult Intelligence Scale (WAIS-III) and the Wide Range Achievement Test (WRAT-III). The latter of these showed that Hanneman read at the 8th grade level, spelled at the 5th grade level and performed arithmetic at the 3rd grade level. The WAIS-III test resulted in a verbal IQ score of 79, a performance IQ of 73 and a full scale IQ of 74.

**II. Analysis**

It is not disputed that Hanneman experienced pain, that he had osteoporosis, cataracts, and a borderline IQ. Instead, the central issue is whether Hanneman's infirmities rendered him wholly incapable of working or, instead, whether they only limited him to sedentary work. Hanneman raises five distinct grounds in this appeal. First, he claims the ALJ erred in failing to address whether Hanneman met the definition of mental retardation. Second, the ALJ "played doctor" when he failed to adequately consider Hanneman's borderline intelligence. Third, the ALJ failed to account for his cataracts. Fourth, the ALJ improperly ignored Dr. Farrell's opinion and discounted the opinion of a vocational expert hired by Hanneman. Finally, the ALJ's determination that Hanneman was "not all that credible" was misplaced.

4

Review, of course, is not *de novo* but is based instead on the important principle that administrative expertise, combined with the conduct of an in-person hearing, renders an ALJ's determination worthy of some level of deference. To that end, the ALJ's decision will be upheld "if it is supported by substantial evidence in the record." *Boiles v. Barnhart,* 395 F.3d 421, 425 (7th Cir. 2005). Evidence is "substantial" when it is "sufficient for a reasonable person to accept as adequate to support the decision." *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir.2003). The ALJ is required to "articulate, at some minimum level, [his] analysis of the evidence." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). An ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir.2000). If the findings of the ALJ are supported by substantial evidence, they are conclusive, and a court is not to substitute its own judgment for the ALJ's. *Boiles,* 395 F.3d at 425. With these considerations in mind, I will address each of the claimant's arguments.

**1. Mental Retardation**

Hanneman first claims that the ALJ should have addressed whether he was mentally retarded within the meaning of the regulations. Those regulations apply when a claimant's IQ score (verbal, performance or full scale) is between 60 and 70. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). Hanneman concedes that none of his scores were that low, but argues that IQ tests can be off by as much as 5 points. If one subtracts 5 from Hanneman's lowest score (73), one would get 68, which would then fall within the retardation range. This fact, Hanneman claims, should have been addressed by the ALJ.

There is no support for Hanneman's argument. Had the regulation sought to account for the potential of tests to overstate claimants' intelligence, the applicable range could have been lowered

5

by 5 points. Indeed, perhaps the regulations have taken that into account already. In any event, the Seventh Circuit has rejected a similar argument already. *See Anderson v. Sullivan,* 925 F.2d 220, 223 (7th Cir. 1991)("Mr. Anderson's score is not qualifying under section 12.05(C). Dr. Hurd found Mr. Anderson's IQ to be 71, and not between 60 and 69. While Mr. Anderson argues that a standard error range of three points should be factored into his score; the Secretary was entitled to rely on the plain language of the regulation.")[1]

**2. Mental RFC**

Hanneman also offers a laundry list of unrelated reasons that the ALJ erred and "played doctor" with respect to Hanneman's mental functioning. First, he notes that "[h]ypothetical questions posed to vocational experts must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart,* 290 F.3d 936, 940-41 (7th Cir. 2002). He argues that the ALJ's hypothetical question to the vocational expert was flawed because it failed to take into account his borderline intelligence. The ALJ improperly "ignored" evidence about Hanneman's low intelligence because, he claims, the ALJ believed the tests were flawed due to Hanneman's use of a magnifying glass and other assistance to complete the exam. In any event, Hanneman argues that because the hypothetical question did not account for Hanneman's borderline IQ, the vocational expert's conclusion that Hanneman could perform light custodial work, light industrial assembly, hand packaging, and sedentary work was flawed. (Tr. 258.)

---

[1]If anything, the score in this case probably *under*stated Hanneman's intelligence given the fact that he was forced, before his cataract surgery, to use a magnifying glass while taking the exam. Moreover, his testimony and his interactions with others indicate an individual who is able to communicate and operate adequately within the system.

6

An initial problem with Hanneman's argument is that the relevance of Hanneman's borderline intelligence is unclear. One of the vocational expert's conclusions was that Hanneman could perform work "like his past job of a custodian, the one that he had after the injury"–that is, light dusting, cleaning, etc., of which there were 4,000 jobs in Wisconsin. (Tr. 258.) There is no argument that Hanneman's IQ somehow dropped from the time he worked at the EAA to the time of the hearing. Thus, if Hanneman was mentally capable of performing that kind of light janitorial work in the past, he was also mentally capable of doing so at the time of the hearing. Because his intelligence presumably remained a constant, it is unclear how the vocational expert's opinion was flawed for failing to account for Hanneman's intelligence.

A more fundamental problem with Hanneman's argument, however, is that it ignores the question actually asked by the ALJ. In total, the question was:

> If you assume for the purposes of this question that an individual of the Claimant's age, education, work experience, and for education we can use his tested levels which were eighth grade reading, fifth grade spelling, and third grade math levels, were limited to simple repetitive jobs of a low stress nature that could be learned through demonstration and repetition. And also further assume exertionally he would be limited, the individual would be limited to light and sedentary work for the purposes of this question. What jobs, if any, could such an individual perform in your opinion?

(Tr. 257-58.) This hypothetical question thus takes into account the fact that Hanneman's performance of mental functions would be that of a typical grade school student; because Hanneman was 48 years old at the time of the hearing, one would conclude based on this hypothetical that Hanneman's intelligence was indeed "borderline." Thus, the vocational expert's opinion would have adequately accounted for Hanneman's mental functioning, and it is doubtful that adding any more specific limitations to the hypothetical question (e.g., "assume that the individual has

7

borderline intelligence") would have materially changed the hypothetical individual involved in the vocational assessment.

But that was not all the ALJ asked. He pressed the vocational expert with an additional question: "If I'd refine the earlier question and add . . . that the job would not involve any writing at all and no need to do any math, even simple arithmetic, would that change your answer . . .?" The expert's answer did not change, because he concluded that the various jobs he'd listed would not require any writing or even simple math. (Tr. 258.) Thus, rather than asking an incomplete RFC hypothetical, the ALJ asked a thorough question based on the exact mental limitations Hanneman had–reading, math, spelling, etc.–and the vocational expert's conclusion was therefore properly founded.

Hanneman's argument then morphs into a contention that the ALJ improperly "ignored" the opinion of Hanneman's vocational expert in favor of the expert who testified at the hearing. Hanneman's expert had stated that he was unable to identify any jobs in the national economy which Hanneman could perform. (Tr. 90.) The ALJ, once again, did not "ignore" the expert's opinion; instead, he discounted it because it was based on a "questionable premise, namely a less than sedentary residual functional capacity as outlined by Dr. Farrell in Exhibit 10F which clearly is not consistent with the objective medical evidence or that physician's own contemporaneous progress notes." (Tr. 22.) Thus, the opinion of Hanneman's vocational expert rises or falls with the opinion of Dr. Farrell; indeed, even the expert who testified at trial came to the same conclusion based on Dr. Farrell's opinion. (Tr. 259.) Dr. Farrell's opinion is discussed later.

Hanneman also takes issue with the fact that the ALJ did not ask whether the vocational expert's testimony conflicted with the Dictionary of Occupational Titles, as required by SSR 00-4p.

8

First, it is doubtful that a mere failure to inquire into any potential definitional conflicts would, on its own, be grounds for reversal. *See Tisoit v. Barnhart,* 127 Fed. Appx. 572, 575 n.1 (3d Cir. 2005). The requirement is meant to ensure that ALJs adequately develop the record so that inconsistencies can be fleshed out and analyzed on appeal. *Rutherford v. Barnhart,* 399 F.3d 546, 556 (3d Cir. 2005). Hanneman has not identified any inconsistencies between the expert's testimony and the Dictionary of Occupational Titles, much less any that would be material to the outcome of this case. At best he claims the job titles given by the expert were "vague and unsubstantiated," but that does not mean they were inconsistent or that the expert's conclusions were not entitled to be relied upon by the ALJ.

> Further, under Seventh Circuit precedent the issue is likely waived:
>
> Presented with a statement of Donahue's abilities and limitations, the vocational expert produced some job titles and numbers. At this point the expert could have been cross-examined (Donahue was represented by counsel) about where these numbers came from, and why the expert's conclusion did not match the Dictionary's. Holding out this opportunity is an approach deemed adequate in Richardson v. Perales. Yet counsel did not ask the vocational expert about the genesis of the numbers or the reason for the discrepancy. What, then, happens when the discrepancy is unexplored? <u>When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's</u>--for the Dictionary, after all, just records other unexplained conclusions and is not even subject to cross-examination.

*Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002)(emphasis added). In sum, it is not a reasonable use of an appellate court's time to inquire into phantom inconsistencies and technical rule violations when the represented claimant failed to raise the issue in the hearing. (Tr. 260. "I don't believe I have any questions, Your Honor.") That is especially true when no discrepancies are pointed out even at this stage.

9

**3. Cataracts**

Hanneman also claims the ALJ erred for failing to find that his poor eyesight made him severely impaired, i.e., that it significantly limited his physical ability to do basic work activities. 20 C.F.R. § 404.1521(a). There is no basis in the record for such an argument, however. The only evidence presented was that Hanneman's cataract surgery had been largely successful, with his right eye being fine and his left eye still producing some blurriness. The ALJ was entitled to conclude, as he did, that "the fact is that he wears only reading glasses and does read per his testimony as well as having a valid driver's license without restriction . . . claimant has no limitations with regard to his vision which would impact on his ability to engage in work activities." (Tr. 21.) Hanneman makes the unusual argument that his eyesight was so bad that he needed surgery and that the ALJ should not have ignored that fact. But *with* the surgery, his eyesight improved dramatically. In assessing Hanneman's residual functional capacity, the ALJ needed to discern which jobs Hanneman could still perform in the economy; whether Hanneman might have had poor eyesight in the past is irrelevant to that analysis.[2]

**4. Weight of the Medical Evidence**

Hanneman next argues that the ALJ erred in discounting the opinion of Dr. Farrell that Hanneman could not sit or stand very long, i.e., that he could not even perform sedentary work. Once again, Hanneman is reduced to setting up the tired straw man argument that the ALJ "ignored" the evidence in question. It is, of course, easy to win a remand if the ALJ actually ignores the opinion of the claimant's treating physician. That did not happen here, however.

---

[2]Hanneman phrases the error as being one of step two (severe impairment), but seems really to attack the ALJ's conclusions about his RFC (step five). (Brief at 25.)

10

Instead, Hanneman's argument, inasmuch as it is intelligible, is simply that the ALJ should have given Farrell's opinion controlling weight because the other evidence in the record did not undercut that opinion. It is thus worth emphasizing exactly what Dr. Farrell's opinion was. Essentially, Farrell believed Hanneman could sit for "about" four hours per day and would need to stand up approximately every 15 minutes. (Tr. 174.) On that basis, Hanneman believes there were no jobs for him in the economy. Taking Farrell's conclusion at face value, one would assume that Hanneman was essentially bed-ridden, however. If he could sit only for four hours during an eight-hour workday and would need to stand up to stretch, walk around, etc., every 15 minutes (but could walk no more than a city block without resting) the rest of his time must presumably be spent in a horizontal position (i.e., lying down). But there was simply no other evidence in the record that Hanneman's condition was even remotely that severe. He sat still until the very end of his interview with Dr. Armentrout, the psychologist, and then only left the appointment with a slight limp. Further, the ALJ observed that "during the course of the entire hearing claimant sat without any difficulty, changing position only once when he and his wife exchanged positions when his wife offered her testimony." (Tr. 20.)

Nor was Farrell's conclusion supported by his own records. In his "to whom it may concern" letter of November 5, 2001, he concluded that Hanneman's "best hope for future employability would be training for a non-manual occupation. I suspect however, that obstacles to this course of action may arise out of his objections even to prolonged sitting." (Tr. 178). That Hanneman might have "objected" to prolonged sitting is not the same as concluding that sitting for long periods of time was simply intolerable. And instead of offering a clear opinion of disability, Farrell's conclusion reached in the November 5 letter is almost studiously vague, a fact which the

11

ALJ seized on to show that it was only Hanneman's subjective "objections" to sitting that rendered him unable to work rather than any objectively demonstrable infirmities. (Tr. 20.) The ALJ thus had a reasonable basis for discounting the opinion of Dr. Farrell.

**5. Credibility**

Finally, Hanneman believes that the ALJ improperly questioned his credibility. The ALJ concluded that

> This case essentially comes down to the issues of pain and credibility and simply stated claimant is not all that credible. He obviously exaggerated his pain complaints, testifying initially that they were constant and like a toothache affecting the back, left knee, and right arm. He claims that the knee was the most painful estimating it to be a 6-7 on a scale of 1-10 . . . then claimed that his back pain, which was presumably less painful, was a '9'. He further claimed that he lies down 5-6 times per day for an hour each time to relieve pain which also appears to be an exaggeration.

(Tr. 20.) Thus, the ALJ had two "in-person" reasons for questioning the claimant's credibility. First, he changed his story–first the left leg was the most painful, then the back. Second, he was able to sit through the hearing in front of the ALJ without any indications of pain or even discomfort. "At the hearing claimant estimated being able to sit for no more than 10-15 minutes, yet he sat for the entire hearing without any difficulty except to change positions with his wife to allow her to testify." (Tr. 20.) Thus, Hanneman did not present himself as the sort of individual who needs to lie down 5-6 times per day for an hour each time to relieve his pain. Without any evidence in the record to support that claim–even from Dr. Farrell–the ALJ was entitled to find, as he did, that Hanneman was "not all that credible."

Hanneman argues that the opinions of other doctors support Hanneman's claims of pain and that therefore the ALJ's credibility finding was erroneous. For instance, Dr. Armentrout noted that

12

Hanneman walked with a slight limp and shifted in his seat at the end of their meeting. Hanneman's physician prior to Dr. Farrell, Dr. Johnson, agreed with the limitations Hanneman had claimed. The question, though, is not whether there is evidence supporting Hanneman's pain–of that, there is no question. Instead, the question is whether the ALJ was entitled to conclude, as he did, that Hanneman was *exaggerating* his pain. The observations of Dr. Armentrout, in fact, do not support Hanneman's credibility at all; just as in the hearing, Hanneman was able to sit through a psychological examination with only minimal discomfort. The fact that he walked with a slight limp afterwards does not mean that his credibility on the matter of his own pain is unassailable.

### III. Conclusion

In sum, Hanneman's best evidence is the opinion of Dr. Farrell, his treating physician. But that evidence itself is vague in its conclusions and does not have any basis in any of Farrell's own records. A check-the-box form concluding that Hanneman could only sit for four hours per workday does not in itself constitute sufficient evidence requiring the ALJ to find it conclusive. Given the paucity of other evidence suggesting such a severe condition, the ALJ was entitled to find that Hanneman was able to work at several jobs in the economy. The motion for summary judgment or for remand is therefore DENIED.

**SO ORDERED.**

Dated this   29th   day of November, 2005.

s/ William C. Griesbach
William C. Griesbach
United States District Judge